**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| United States of America, | No. CR-14-01633-TUC-JGZ (CRP) |
|---|---|
| Plaintiff, | **REPORT & RECOMMENDATION** |
| v. | |
| Sandra Garcia-Pascual, et al., | |
| Defendants. | |

Defendants Liliana Verenice Santiz-Gomez ("Santiz-Gomez[1]"), also known as Sandra Garcia-Pascual, and Marta Cleotilde Mendez-Molina, are charged by indictment with assault of a federal officer in violation of 18 U.S.C. § 111(a)(1).  Each Defendant has filed a Motion to Suppress Statements.  (Doc. 19 (Mendez-Molina); Doc. 24 (Santiz-Gomez)).  The Government has responded to each motion (Docs. 22, 26) and Santiz-Gomez filed a Reply (Doc. 29).  Defendants' Motions came on for evidentiary hearing on January 5, 2015.  (Doc. 38 (Transcript)).  At the hearing, the following witnesses testified on behalf of the government:  Border Patrol Agent Alexis Berrios, Border Patrol Agent Fernando Moreno, Border Patrol Agent Andrea Gutierrez, and Border Patrol Agent Miguel Soto.  At the hearing, the following exhibits were admitted into evidence:  Field Processing Form 826 for Mendez-Molina (Exh. 4); Field Processing Form 826 for Santiz-Gomez (Exh. 5); Advisory of Rights (Spanish) for Santiz-Gomez (Exh. 15); partial

---

[1]  When referring to Santiz-Gomez/Garcia-Pascual by name, the witnesses primarily use the name "Santiz-Gomez".  For clarity, the Magistrate Judge refers to this Defendant as Santiz-Gomez, as well.

transcript of video-taped interview of Santiz-Gomez (Exh. 16)[2]; DVD recording of interview of Santiz-Gomez (Exh. 17); and Field Processing Form (blank) (Exh. 28).

For the following reasons, the Magistrate Judge recommends that the District Court, after its independent review:  (1) deny Mendez-Molina's Motion to Suppress Statements; and (2) grant in part and deny in part Santiz-Gomez' Motion to Suppress Statements.

**INTRODUCTION**

Both Defendants challenge statements made to Agent Berrios in the field under *Miranda* and as involuntary.  Santiz-Gomez also challenges statements made to Agent Roman in the field subsequent to arrest, and statements made at the Tucson Coordination Center ("Border Patrol Station") to Agents Moreno and Gutierrez.

At the hearing, the government stated that it intends to introduce statements both Defendants made to Agent Berrios in the field immediately upon apprehension, and statements Santiz-Gomez made at the Border Patrol Station to Agents Moreno and Gutierrez.  (Tr. at pp. 5-8).  The government does not intend to introduce Defendants' statements to Agents Berrios and Roman made in the field "about 45 minutes to an hour" after apprehension, when the Agents and Defendants arrived at the Agents' vehicles. (*Id.*).  Nor does the government intend to introduce Defendants' statements to Agents Soto and Manning during immigration processing at the Border Patrol Station.  (*Id.*).

**STATEMENTS IN THE FIELD TO AGENT BERRIOS**

**TESTIMONY.**  Agent Berrios, who is a native, fluent Spanish speaker assigned to the area near Arivaca and Sasabe, Arizona, testified that on September 2, 2014, he was alerted that a Border Patrol "mobile surveillance capability" (a truck with a camera attached to it) "spotted a group of possibl[e] aliens" in a remote area where he has previously worked and where "we encountered a lot of illegal alien activity, as well as contraband."  (Tr. at

---

[2] Upon the parties' oral stipulation at the hearing, the Magistrate Judge permitted the parties to submit the entire transcript of the video-taped interview of Santiz-Gomez once it was prepared.  The parties have submitted that transcript and the Magistrate Judge forwards a copy of the transcript to the District Court together with this Report and Recommendation.  The interview transcript is cited as "Interview".

pp. 11-12, 14-15; 17, 52, 96).  It took him approximately 45 minutes to drive to the area. (Tr. at p. 14).  Upon arrival, he "noticed a human foot sign".  (Tr. at p. 14).  The track was not on a designated hiking trail and the area was not accessible to the public.  (*Id.*). He tracked the signs for about two hours until he came upon Defendants who were lying side by side under a bush.  (Tr. at pp. 14, 17, 60).  Because the terrain was on a slope, "they were more on a 45 degree angle, so…[they] were almost laying down, sitting down."  (Tr. at p. 61).  Agent Berrios, who was dressed in uniform, approached Defendants while identifying himself as a Border Patrol Agent in Spanish.  (Tr. at p. 16). Defendants did not move.  (Tr. at p. 60).  After announcing himself a second time, he simultaneously grabbed both Defendants by their wrists or hands. (TR. at pp. 17, 61-63). During this time, Agent Berrios gave verbal commands for Defendants to stand up.  (Tr. at p. 63).  When Defendants stood up, they pushed Agent Berrios who lost his footing, and both Defendants took off running in separate directions.  (Tr. at pp. 64-65).

Agent Berrios saw Santiz-Gomez fall twice on loose rock as she tried to climb the slope.  (Tr. at pp. 65-66).  The second time she fell, Santiz-Gomez fell onto her stomach and that gave Agent Berrios time to catch up to her and affix a handcuff to her right hand. (Tr. at pp. 68-69).  Santiz-Gomez broke Agent Berrios' grip, rolled over, and struck the back of his left hand and his face.  (Tr. at pp. 70-71).  While she was striking at the Agent, he was able to pull her hand, get her back on her stomach, and grab and secure both of her hands.  (Tr. at p. 76).

In the meantime, Mendez-Molina had run about 15 yards on more level ground, and dove into a brush area.  (Tr. at p. 67).  After securing Santiz-Gomez, Agent Berrios walked her over to the area where Mendez-Molina was hiding, all the while Santiz-Gomez was trying to kick him and pull away.  (Tr. at pp. 76-77).  Upon seeing Mendez-Molina on the ground "laying kind of like in a ball on her right side", Agent Berrios again identified himself.  (Tr. at p. 78).  Mendez-Molina began hitting at Agent Berrios, while at the same time Santiz-Gomez tried to run but fell to the ground next to Mendez-Molina. (Tr. at p. 79).  While both Defendants were on the ground, Mendez-Molina began to kick

Agent Berrios in the chest.  (*Id.*).  It was at this time that Agent Berrios "pulled my baton out, and I yelled, and they—they became compliant."  (*Id.; see also id.* ("[I] put my left hand, reach out and got my baton.  I yelled, you know, stop resisting, stop hitting me.  And that's when they kind of stopped."); *see also* Tr. at p. 80 (Agent Berrios' baton is made of collapsible steel and he "extended it out, and I gave verbal commands.  That's it."); *see also* Tr. at p. 83 ("I took a step back, and I extended my collapsible baton."); Tr. at p. 105 ("I gave verbal commands, you know, stop it, that's it.  I pulled my baton out, meaning that I can't fight any more with you guys, I'm exhausted, and if there is any more striking—and I actually said it; you know, stop hitting me, or I'm going to have to use force.")).  Agent Berrios testified that he extended the baton at an angle behind his body and he never brought the baton out in front of his body, nor did he raise it above his waist level.  (Tr. at p. 118).  He never pointed it towards either of the Defendants.  (*Id.*).

Agent Berrios had the baton out for 10 to 15 seconds.  (Tr. at p. 80).  With the baton extended, he placed it behind his knee so that he was able to "grab Santiz-Gomez.  And that's when I was able to put a handcuff on Mendez-Molina, one hand to Santiz-Gomez['] other hand."  (*Id.*; *see also* Tr. at pp. 106, 117-18).  Agent Berrios had his baton out for "[a] couple seconds."  (Tr. at p. 30).  Agent Berrios did not take out any other weapons during his encounter with Defendants.  (*Id.*).

After Defendants were handcuffed, Agent Berrios asked them whether they were all right and whether they needed medical attention.  (Tr. at p. 19).  Mendez-Molina lifted her shirt "exposing her bra, and showing me a small laceration.  I asked her if she was all right; she said she was fine."  (Tr. at p. 19; *see also id.* (Mendez "declined medical attention.")).  Agent Berrios next "conducted an immigration inspection.  Basically, all I did was ask biographical information:  Name, date of birth, place of birth, and the immigration inspection itself."  (Tr. at p. 20; *see also* Tr. p. 42 ("the purpose of the…encounter itself, it was immigration; it was not criminal.")).  Agent Berrios also inquired as to Defendants' country of citizenship and whether they had documents to be in the United States.  (Tr. at pp. 43-44). The questioning was brief and lasted a minute or

two.  (Tr. at p. 20).  During this questioning, Agent Berrios did not have any weapons out.  (*Id.; see also* Tr. at p. 30).  When he asked Defendants these questions, they were both handcuffed because "they were combative and resisting."  (Tr. at p. 23).  Had they not resisted, Agent Berrios probably would not have handcuffed them.  (*Id.*).  Agent Berrios testified that he did not read Defendants their *Miranda* rights at this time "because I was doing an immigration inspection, not criminal inquiry, and I didn't ask anything more than biographical information."  (Tr. at p. 98).  Agent Berrios testified that he asks immigration questioning in the field immediately upon apprehension because "we want to make sure that they are, in fact, illegally present in the United States."  (Tr. at p. 23).

After Defendants responded to Agent Berrios' immigration questioning, he informed them they were under arrest and Santiz-Gomez said "that she needed them [sic] to talk to her lawyer because she felt that I was too rough."  (Tr. at p. 24; *see also* Tr. at p. 48 (Agent Berrios testifying on cross-examination that Santiz-Gomez stated:   "then I need to speak with my lawyer because I think you've been to[o] rough.")).  Agent Berrios agreed with counsel for Santiz-Gomez that Santiz-Gomez used the word "'[t]hen,'…not in the temporal sense of right now, but 'then' in the sense of based on what you've told me."   (Tr. at p. 48).   Agent Berrios felt that Santiz-Gomez' statement was a "reaction…after I didn't react [to] Mendez exposing her bra, and me telling them that they were under arrest."  (Tr. at pp. 49-50).  Santiz-Gomez did not ask to have a lawyer present at that time.  (Tr. at pp, 24-25).

Thereafter, other agents and a helicopter arrived.  (Tr. at p. 25).  After giving Defendants water, Agent Berrios and another agent walked Defendants back to the Border Patrol vehicles, which was about a 45-minute walk.  (*Id.*).  During the walk, Agent Berrios did not ask Defendants any questions and Defendants did not make any statements.  (*Id.*).  Agent Berrios testified that Defendants' demeanor was calm and they sang and tried "to strike conversation."  (*Id.*).

Upon arrival at the vehicles, Agent Berrios read Mendez-Molina the advice of

rights from Form 826 and asked her biographical information, and Agent Roman did the same with Santiz-Gomez.   (Tr. a p. 26; *see also* Tr. at p. 27 (Agent Berrios read "verbatim from…the form itself, and then I give it to…[the subject] and they read it….."); Tr. at p. 44 (the first time Agent Berrios wrote down any biographical information was back at the vehicles when completing Form 826)).   The advice of rights on From 826 is not the *Miranda* warning, instead Form 826 advises of "[i]mmigration rights."[3]   (Tr. at p. 27; *see also* Exhs. 4, 5).   Santiz-Gomez refused to sign the form.   (Tr. at p. 28; *see also* Exh. 5).   Agent Berrios did not ask either Defendant any questions that were not included on the form.   (Tr. at pp. 28-29).

After going over Form 826 with Defendants, the agents drove Defendants to the station, which took approximately three hours.   (Tr. at p. 29).   On the drive, Defendants did not say anything to the agents, although they whispered between themselves, and the agents did not ask them any questions.   (Tr. at pp. 29-30).

**DISCUSSION.**   Both Defendants object to questioning in the field immediately upon apprehension without having received *Miranda* warnings.   They also argue the statements were not voluntary.   Santiz-Gomez further argues that her request for counsel was not honored and, thus, all statements following that request must be suppressed.

---

[3] The advisement of rights from Form 826 reads:

You have been arrested because immigration officers believe that you are illegally in the United States. You have the right to a hearing before the Immigration Court to determine whether you may remain in the United States.  If you request a hearing, you may be detained in custody or you may be eligible to be released on bond, until your hearing date. In the alternative, you may request to return to your country as soon as possible without a hearing.

You have the right to contact an attorney or other legal representative to represent you at your hearing, or to answer any questions regarding your legal rights in the United States. Upon your request, the officer who gave you this notice will provide you with a list of legal organizations that may represent you for free or for a small fee. You have the right to communicate with the consular or diplomatic officers from your country. You may use a telephone to call a lawyer, other legal representative, or consular officer at any time prior to your departure from the United States.

(Exh. 28; *see also* Tr. p. 88 (Agent Berrios testifying that Exhibit 28, which is an English version of Form 826 is an accurate English translation of the rights that Agent Roman read to Santiz-Gomez)).

The government argues that *Miranda* does not apply to the field questioning and that the statements were voluntarily made.  The government also argues that Santiz-Gomez did not invoke her right to counsel.

As to Defendants' statements made in the field to Agent Berrios immediately upon apprehension, it is well-settled that officers may briefly detain an individual if they have reasonable suspicion that crime is afoot.  *See Terry v. Ohio,* 392 U.S. 1, 29 (1968).  The Ninth Circuit has recognized that "'[a]ny number of factors may be taken into account in deciding whether there is reasonable suspicion to stop [someone] in the border area.... [B]ehavior may be relevant, as...obvious attempts to evade officers can support a reasonable suspicion.'"   *United States v. Cervantes,* 421 F.3d 825, 830 (9th Cir. 2005) (quoting *United States v. Brignoni–Ponce*, 422 U.S. 873, 884–85 (1975)), *overruled on other grounds by Melendez-Diaz v. Massachusetts,* 557 U.S. 305 (2009).

Here, Defendants were in an area known for illegal entry and narcotics smuggling and Agent Berrios was responding to an alert of activity in that area.  Agent Berrios found Defendants lying under a bush and they ignored him when he announced himself and gave verbal commands.  Once he attempted to get them to stand up, they pushed him and took off running in separate directions.  As he tried to apprehend Santiz-Gomez, she struggled, hit and kicked at him, and continued in her efforts to run away.  Likewise, Mendez-Molina, who had run to hide in some bushes, also kicked at Agent Berrios when he approached her.  Under these circumstances, Agent Berrios "could ask [Defendants] questions 'reasonably related in scope to the justification for their initiation.'"   *Id.* (quoting *Terry,* 392 U.S. at 29).  "An 'officer may question [individuals reasonably detained near the border] about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause.'" *Id.* (quoting *Brignoni–Ponce,* 422 U.S. at 881–82). Agent Berrios asked Defendants their names, dates and places of birth, their country of citizenship, and whether they had documents to be in the United States.  (Tr. at pp. 20, 43-44). The questioning was brief, lasting a few minutes.  (Tr. at p. 20).  As in *Cervantes,*

- 7 -

1    such questioning is reasonably related to whether Defendants had crossed the border

2    illegally and is, thus, permissible.  *See Cervantes,* 421 F.3d at 830.

3         Moreover, the fact that Agent Berrios handcuffed Defendants did not convert the

4    *Terry* stop into a custodial arrest.  "'Handcuffing a suspect does not necessarily dictate a

5    finding of custody.'" *Id.* (quoting *United States v. Booth*, 669 F.2d 1231, 1236 (9th

6    Cir.1981)).  For example,"[w]here a suspect threatens physical danger or flight, officers

7    may use handcuffs in the course of a *Terry* stop." *Id.* (citation omitted); *see also United*

8    *States v. Medina-Villa,* 567 F.3d 507, 519 (9th Cir. 2009) ("[W]e have approved of *Terry*

9    stops that include handcuffing the suspect during questioning...."). Further, the Ninth

10   Circuit has upheld questioning without the *Miranda* advisement where "the border patrol

11   agent prevented [the fleeing defendant] from leaving [a] parking lot by blocking his car,

12   approaching it with his gun drawn, and interrogating him about his citizenship and

13   immigration status…", finding that "the agent did not venture beyond the restraints of

14   *Brignoni-Ponce, Terry, or Berkemer.*"  *Medina-Villa,* 567 F.3d at 519 (encounter was

15   non-custodial).  Here, Defendants ran from Agent Berrios, did not stop running when he

16   instructed them to do so, and physically resisted him by striking and kicking at him at

17   every opportunity that presented itself to them. When Agent Berrios first encountered

18   Defendants, he had been tracking them for some time and no other agents were

19   immediately present; it was not until after he had handcuffed and questioned Defendants

20   that another agent arrived on the scene.  Agent Berrios testified he had handcuffed

21   Defendants because "they were combative and resisting."  (Tr. at p. 23).  Agent Berrios'

22   use of handcuffs was justified and Defendants statements are not rendered inadmissible

23   because they were handcuffed while Agent Berrios questioned them.  *See e.g. Cervantes,*

24   421 F.3d at 830.

25        As to voluntariness,

26        [t]he test is whether, considering the totality of the circumstances, the
          government obtained the statement by physical or psychological coercion
27        or by improper inducement so that the suspect's will was overborne. *Haynes*
          *v. Washington*, 373 U.S. 503, 513–14, 83 S.Ct. 1336, 10 L.Ed.2d 513,
28        (1963). A statement is involuntary if it is "extracted by any sort of threats

or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *Hutto v. Ross*, 429 U.S. 28, 30, 97 S.Ct. 202, 50 L.Ed.2d 194, (1976) quoting *Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 42 L.Ed. 568 (1897).

*United States v. Coutchavlis*  260 F.3d 1149, 1158 (9th Cir. 2001) (quoting *United States v. Guerrero,* 847 F.2d 1363, 1366 (9th Cir.1988)).   "Coercive police activity is a necessary predicate to findng that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Colorado v. Connelly,* 479 U.S. 157, 167 (1986).  "In short, the true test of admissibility is that the confession is made freely, voluntarily, and without compulsion or inducement of any sort." *Haynes v. State of Washington*, 373 U.S. 503, 513-14 (1963) (citation and internal quotation marks omitted).  The government bears the burden of establishing that a confession was voluntary by a preponderance of the evidence. *United States v. Bautista*, 362 F.3d 584, 589 (9th Cir. 2004).

The record reflects that at one point during the encounter, Agent Berrios pulled out his baton.  However, the evidence of record is that Agent Berrios kept the baton angled behind him, did not bring it in front of his body, and did not hit Defendants with it.  After he secured Defendants, he placed the baton back into his belt and he never withdrew or used any other weapons during the encounter.  Agent Berrios did not have any weapons or the baton out while he was questioning Defendants in the field immediately after their apprehension.   The record supports the conclusion that Defendants' responses were voluntary.

Consequently, Defendants responses to Agent Berrios' questions in the field immediately upon apprehension are admissible.

The next question is whether Santiz-Gomez invoked her right to counsel while in the field with Agent Berrios.  Agent Berrios testified that when he told Defendants that they were under arrest, Santiz-Gomez stated:  "then I need to speak with my lawyer because I think you've been to[o] rough."  (Tr. at p. 48).  Santiz-Gomez contends that her request for counsel was not honored in light of the fact that she was later questioned by other agents.  The government counters that Santiz-Gomez' statement did not constitute

1    an invocation of the right to counsel.

2        A suspect must "articulate his desire to have counsel present sufficiently clearly

3    that a reasonable police officer in the circumstances would understand the statement to be

4    a request for an attorney. If the statement fails to meet the requisite level of clarity…",

5    officers are not required to cease questioning. *Davis v. United States,* 512 U.S. 452, 459

6    (1990). Although the "[i]nvocation of the *Miranda* right to counsel 'requires, at a

7    minimum, some statement that can reasonably be construed to be an expression of a

8    desire for the assistance of an attorney,' … a reference to an attorney that is ambiguous or

9    equivocal in that a reasonable officer in light of the circumstances would have understood

10   only that the suspect *might* be invoking the right to counsel…" does not constitute the

11   invocation of the right to counsel under *Miranda.   Davis*, 512 U.S. at 459, (quoting

12   *McNeil v. Wisconsin,* 501 U.S., 171, 178 (1991)) (emphasis in original).   Recently, the

13   Ninth Circuit found a request for counsel to be unambiguous where the defendant asked

14   "before receiving any advice regarding counsel [*i.e.,* pre-*Miranda*]…There wouldn't be

15   any possible way that I could have a—a lawyer present while we do this?'" and soon

16   thereafter stated: "Yeah, that's what my dad asked me to ask you guys…Uh, give me a

17   lawyer." *Sessoms v. Grounds,* __ F.3d __, 2015 WL 294273 at *1, *8-9 (9th Cir. Jan. 23,

18   2015) (the court considered "the two statements together and in context").   The Ninth

19   Circuit has also held that the defendant's questions "[c]an I get an attorney right now?;"

20   "[y]ou can have an attorney right now, man?;" and "[w]ell, like right now you got one?"

21   taken together, constituted an unambiguous request for an attorney. *Alvarez v. Gomez*,

22   185 F.3d 995, 998 (9th Cir.1999).

23       At bottom, the court must "analyze whether a reasonable officer viewing the

24   situation in light of all of the circumstances leading up to the statements would have

25   understood [the defendant's] statements to be a request for counsel." *Sessoms,* __ F.3d

26   __, 2015 WL 294273 at *12.  Importantly, "[c]ontext and circumstances matter." *Id.*

27       Santiz-Gomez made her statement after she had been told she was under arrest but

28   before she had been *Mirandized.   See Sessoms,* __ F.3d __, 2015 WL 294273 at *4

(recognizing that Supreme Court has suggested "that *Davis*'s requirement of an unambiguous invocation of a right to counsel applies to pre-*Miranda* statements" and applying the *Davis* standard to pre-*Miranda* statement). Santiz-Gomez did not ask to have a lawyer present. Instead, in response to being told she was under arrest, she stated "then I need to speak with my lawyer because I think you've been to[o] rough." (Tr. at p. 48). Nothing in this statement suggests that she wanted an attorney at that moment. In light of the context and circumstances in which Santiz-Gomez made this statement, together with the wording of her statement, a reasonable officer in Agent Berrios' position would not have understood her statement to be an invocation of her right to counsel under *Miranda*. Therefore, Santiz-Gomez' Motion to Suppress should be denied on this issue.

**STATEMENTS AT THE TUCSON BORDER PATROL STATION**

**TESTIMONY.** At the border patrol station, Agent Moreno, with Agent Gutierrez present, conducted a video-taped interview of Santiz-Gomez, which lasted approximately 45 minutes, from 11:46 p.m. to 12:31 a.m.. (Exhs. 16, 17; Tr. at pp. 125-26, 153, 163; Interview). Both agents wore plainclothes and no weapons were visible. (Tr. at p. 152).

After informing Santiz-Gomez that the interview was being recorded, Agent Moreno, who is fluent in Spanish, asked Santiz-Gomez whether she was under the influence of alcohol or drugs, how she felt health wise, her country of citizenship, and about names she had used and prior arrests. (Interview, pp. 1-4; Tr. at p. 128). Agent Moreno testified that he asks these questions before giving the *Miranda* advisement so that he can ensure the subject understands Spanish and is capable of understanding her rights, waiving her rights, and making a statement. (Tr. at pp. 162-63).

Agent Moreno next read Santiz-Gomez the *Miranda* advisement verbatim from Form I-214. (Tr. at p. 128; *see also* Interview at p. 4). When next asked whether she understood her rights, Santiz-Gomez answered: "Yes." (Interview at p. 4). The following exchange took place when Agent Moreno next asked Santiz-Gomez whether she was willing to answer questions without an attorney present or whether she preferred

1  to have an attorney present:

2          [Santiz-Gomez]:     Ay, I don't know…

          [Agent Moreno]:     Well I cannot advise you of anything the decision will
3                              have to be yours, just as I explained in the rights, did
                               you understand the rights yes or no?
4          [Santiz-Gomez]:     Yes.

5          [Moreno]:           Okay, so what do you want, do you want to talk to me
                               now? Or do you prefer to have an attorney present
6                              with you?

7          [Santiz-Gomez]:     But what is the difference that I can talk to you or talk
                               to the lawyer?
8          [Moreno]:           The lawyer can advise you.

9          [Santiz-Gomez]:     But does that means that I want to fight the case?

          [Moreno]:           Because I, I have, I'll have to ask you some questions,
10                             I'm investigating a case today and I have to ask you a
                               series of questions, but before I can ask you questions,
11                             I had to read your rights, you just told me that you
12                             understand the rights, but what do you want? So you
                               want to talk to me now or do you prefer to have a
13                             lawyer present with you before I ask you questions?
                               You have to decide that.
14
          [Santiz-Gomez]:     Yes I understand, to take me to a lawyer and they will
15                             ask me questions.

16         [Moreno]:           No no no I want to ask them right now.

          [Santiz-Gomez]:     But it's just that, are you asking me that if I prefer you
17                             asked me questions or the lawyer?

18         [Moreno]:           That's why…

          [Santiz-Gomez]:     Not both.
19
          [Moreno]:           Un-huh, and what do you want? You want a lawyer
20                             present with you or would you rather talk to me right
                               now?
21         [Santiz-Gomez]:     It's just that I do not understand.

22         [Moreno]:           What do you not understand? What I just explained if
                               not, if you have no money to employ an attorney the
23                             government of the United States can give you one for
                               free.
24
          [Santiz-Gomez]:     I mean what I understand is that if I want to fight the
25                             case, that, that, that's what I understand, I don't know.

26         [Moreno]:           I mean, what case do you want to fight?

          [Santiz-Gomez]:     I mean, well we it [sic] a case that you fight with a
27                             lawyer, you give them the bail and...

28         [Moreno]:           Oh, that's apart, that is...you're talking about, your
                               deportation or court, or what...explain yourself what's

| | | |
|---|---|---|
| | | that about. |
| [Santiz-Gomez]: | | Yes the deportation. |
| [Moreno]: | | Okay, the questions I'm going to ask you are regarding the case, your arrest today, do you understand that? |
| [Santiz-Gomez]: | | Mm-hm (yes). |
| [Moreno]: | | So you understand why you were arrested yes or no? |
| [Santiz-Gomez]: | | Hm…well I do understand that because I am violating the laws of the United States. |
| [Moreno]: | | Mm-hm (yes). |
| [Santiz-Gomez]: | | Yes that is what I understand. |
| [Moreno]: | | Okay, and regarding what happened today...with the official... |
| [Santiz-Gomez]: | | Well I don't know what happened |
| [Moreno]: | | Well that's why I want to ask you questions regarding that case, but I cannot ask you questions without you telling me what [sic] that you want to talk to me or if you would rather have an attorney sitting here next to you before I ask you questions, what you're not getting [sic]? What are you not understanding? |
| [Santiz-Gomez]: | | Yes, that is fine, yes. |
| [Moreno]: | | So do you want to talk to me right now? |
| [Santiz-Gomez]: | | Yes. |
| [Moreno]: | | Are you conscious of mind of what you're doing right now yes or no? |
| [Santiz-Gomez]: | | Yes, if it's about the officer yes. |
| [Moreno]: | | Okay, that's fine...here next to the X add your signature, what you're saying now is that you want to talk to me without having a lawyer sitting here next to you you [sic], do you understand that yes or no? |
| [Santiz-Gomez]: | | Yes. |
| [Moreno]: | | Okay. |
| [Santiz-Gomez]: | | Like I said if it's about the officer I agree. |

(Interview, pp. 5-9).

Agent Moreno testified that Santiz-Gomez signed the form to indicate that she understood her rights and waived them.  (Tr. at pp. 131-33, 142; *see also* Exh. 15 (Santiz-Gomez signed that she understood her rights at 11:49 p.m. and waived her rights at 11:55 p.m.)).  Agent Moreno testified that when he first explained her rights to her, Santiz-Gomez was confused.  (Tr. at p. 133; *see also* Tr. 134-142 (Agent Moreno reading from the interview transcript and testifying that he clarified that Santiz-Gomez wanted to speak

- 13 -

1   with him)).

2        After Santiz-Gomez indicated that she would waive her rights, Agent Moreno read

3   her "consulate rights". (Interview, p. 10). He next showed Santiz-Gomez Form 826, (*see*

4   Tr. at pp. 129-30), and asked:

5        [Moreno]:         Do you remember this form miss? This form was

6                                  shown to you by the officers today when you were

7                                  arrested…here I point to your names, the officers

                               explained to you if you would like to return as soon as

8                                  possible to your country without a hearing with the

                               immigration judge, remember that yes or no?

9        [Santiz-Gomez]:   If they told me?

10       [Moreno]:         Uh-huh (yes).

     [Santiz-Gomez]:   No.

11       [Moreno]:         No, you were not told?

12       [Santiz-Gomez]:   No.

     [Moreno]:         Okay, you have the opportunity whenever arrested by

13                                 the Border Patrol they give you the opportunity if you

14                                 would like to return as soon as possible to your

                               country without a hearing with the immigration judge,

15                                 as we are working a case against you, I have to explain

16                                 to you that these rights are no longer valid, which is

                               why I had to read the rights and I have to talk to you,

17                                 do you understand that yes or no?

18       [Santiz-Gomez]:   Yes.

19  (Interview at pp.9-10). Agent Moreno testified at the hearing that the "immigration

20  rights" he was referring to were the rights from Form 826 that were read to Defendants in

21  the field. (Tr. at p. 129-30). The immigration rights no longer applied "[b]ecause we're

22  contemplating criminal proceedings." (Tr. at p. 130).

23       Agent Moreno then explained that he was going to place Santiz-Gomez under oath

24  and that if she did not tell him the truth while under oath, she could be punished for

25  perjury. (Interview, p.10). He asked her whether she understood and she replied, "Yes".

26  (*Id.*). Before placing Santiz-Gomez under oath, Agent Moreno asked: "Are you

27  currently willing to answer my questions under oath now with no one else present? Yes

28  or no?" and Santiz-Gomez responded: "Yes." (Interview at p. 11).

     Near the end of the interview, Agent Moreno stated: "Okay, now let me explain

the case that the government and the charges that the government of the United States is going to give you, we are investigating….” (Interview at p. 43) He then stated that Santiz-Gomez would first be charged with illegal entry. (*Id.*). He also stated that: “We are investigating the assault case against an officer, so if the immigration judge finds you guilty, that will be the second charge, of assault on an officer, you understand that charge, yes or no?”, to which Santiz- Gomez responded “Yes.” (Interview at p. 44). He also informed her that she could be charged with perjury if she lied during the interview. (*Id.*). At the conclusion of the interview, the following exchange occurred:

| [Moreno]: | Okay, during this interview, have you been the subject of promises, threats, pressure, or corrections of any kind during this interview? Did we make promises, have we corrected you in some way, have we threatened you in some way during this interview? |
|---|---|
| [Santiz-Gomez]: | No. |
| [Moreno]: | Okay, have all you[r] answers been voluntary and correct? |
| [Santiz-Gomez]: | Yes. |

(Interview, p. 45).

Agent Moreno testified that after he placed Santiz-Gomez under oath, she never expressed any hesitancy to continue to talk with him, she was cooperative, and did not refuse to answer any questions. (Tr. at p. 143). Agent Moreno further testified, and review of the interview transcript confirms that, after waiving her rights, Santiz-Gomez never brought up wanting an attorney. (*Id.*; *see also* Interview). Nor did Santiz-Gomez mention that the officer had been too rough with her. (Tr. at p. 143). She confirmed that Agent Berrios did not hit her. (Tr. at p. 144).

Agent Moreno also testified that even though he asked Santiz-Gomez some preliminary questions at the beginning of the interview, he did not ask her about the incident with Agent Berrios until after she had waived her rights at 11:55 p.m. (Tr. at p. 163).

Agent Gutierrez, a native Spanish speaker who was present during Agent Moreno’s interview of Santiz-Gomez, testified that Santiz-Gomez “did seem confused,

but Agent Fernando Moreno explained everything that he needed to, to her, and she agreed to talk so…"  (Tr. at pp. 180-81).  According to Agent Gutierrez, after Agent Moreno's explanation, Santiz-Gomez no longer appeared confused.  (Tr. at p. 181).

At the Border Patrol station, prior to Santiz-Gomez' interview by Agent Moreno, Agent Soto asked Santiz-Gomez questions from Forms 213 and 215-B, which were related to the administrative immigration proceeding.  (Tr. at pp. 185-86; *see also* Tr. at p. 185 (Agent Soto verified Santiz-Gomez' biographical information)).  He did not speak with Santiz-Gomez about the criminal violation.  (Tr. at p. 185).  Agent Soto testified that after he began his interview, and "got all the biographical information from her,…then they took her…" to be interviewed by Agents Moreno.  (Tr. at p. 200; *see also* Tr. at p 186).  The interview with Agents Moreno and Gutierrez occurred before Agent Soto had advised Santiz-Gomez of her administrative immigration rights.  (Tr. at p. 200).  After Santiz-Gomez' interview by Agents Moreno and Gutierrez, Agent Soto was informed that she been advised of her *Miranda* rights.  (*Id*).  The government does not intend to introduce Santiz-Gomez' statements made to Agent Soto.  (Tr. at p. 5)**.**

**DISCUSSION.**  Santiz-Gomez argues that the government is unable to bear its burden of establishing that her *Miranda* waiver was made voluntarily, knowingly, and intelligently. This is primarily because "*Miranda* warnings must be conveyed to a person 'clearly' and in a manner that is 'unambiguous'", and Santiz-Gomez contends that Agent Moreno failed to meet this standard during his interview.  (Reply (Doc. 29), p. 3 (quoting *United States v. San Juan-Cruz,* 314 F.3d 384, 389 (9th Cir. 2002)).

"Regardless of circumstance, the *Miranda* warning must be read and conveyed to all persons clearly and in a matter that is unambiguous."  *San Jan-Cruz,* 314 F.3d at 398. Thereafter, a defendant may waive his or her *Miranda* rights as long as the waiver is voluntary, knowing, and intelligent.  *Patterson v. Illinois,* 487 U.S. 285, (1988); *Moran v. Burbine,* 475 U.S. 412, 421 (1986); *Juan H. v. Allen,* 408 F.3d 1262, 1271 (9th Cir. 2005). To be knowing and intelligent, the defendant must have made the waiver "with a full awareness of both the nature of the right being abandoned and the consequences of the

decision to abandon it." *Moran,* 475 U.S. at 421.   Only if the "'totality of the circumstances surrounding the interrogation'" reveals both an uncoerced choice and the requisite level of comprehension may the court properly conclude that a defendant has waived his *Miranda* rights. *Id.* at 421 (quoting *Fare v. Michael C.,* 442 U.S. 707, 725 (1979)); *see also United States v. Shi,* 525 F.3d 709, 727 (9th Cir. 2008) (the validity of a *Miranda* waiver depends on the totality of the circumstances, including the defendant's background, experience, and conduct); *United States v. Crews,* 502 F.3d 1130, 1140 (9th Cir 2007).   There is a presumption against wavier, which the government bears the burden of overcoming by a preponderance of the evidence. *North Carolina v. Butler,* 441 U.S. 369, 375-75 (1979); *Crews,* 502 F.3d at 1140.

The Ninth Circuit has identified several factors for consideration when determining whether a defendant's waiver is valid:  (1) the defendant's mental capacity; (2) whether the defendant signed a written waiver; (3) whether the defendant was advised in his or her native tongue or had a translator; (4) whether the defendant appeared to understand his or her rights; (5) whether the defendant's rights were individually and repeatedly explained to him or her; and (6) whether the defendant has prior experience with the criminal justice system. *Crews,* 502 F.3d at 1140.

There is nothing in the record to suggest that Santiz-Gomez was of any diminished capacity that prevented her from understanding the nature of her rights or the consequences of abandoning them.   Agent Moreno read her rights to her in Spanish and she was advised of her rights individually as she was the only person being interviewed. The record does not reflect that Santiz-Gomez had prior experience with the criminal justice system.   There is no question that Santiz-Gomez expressed confusion about the right to counsel and waiving same, stating at one point:   "It's just that I do not understand."   (Interview, p. 6).   At that point, Agent Moreno again advised that the government would pay for an attorney if Santiz-Gomez could not afford one, and Santiz-Gomez responded:   "I mean what I understand is that if I want to fight the case, that, that, that's what I understand, I don't know."   (Interview, p. 7).   After more discussion, Santiz-

Gomez indicated that she wanted to fight the deportation.  (*Id.*).  Agent Moreno then confirmed that Santiz-Gomez was aware she had been arrested that day and stated that he wanted to talk to her "regarding what happened today…with the official." (*Id.*).  He again stated that he could not ask questions "without you telling me what [sic] that you want to talk to me or if you would rather have an attorney sitting here next to you before I ask you questions, what you're not getting [sic]? What are you not understanding?", to which Santiz-Gomez replied:  "Yes, that is fine, yes." (Interview, p. 8).  Agent Moreno did not immediately proceed to questioning, though.  He first confirmed that she wanted to talk to him and explained she needed to sign to indicate that "you want to talk to me without having a lawyer sitting here next to you, do you understand that yes or no?" (*Id.*).  Santiz-Gomez stated: "Yes", and added: "Like I said if it's about the officer I agree." (*Id.* at pp. 8-9).  An officer's "rearticulation of the *Miranda* rights…" can serve to eliminate confusion.  *See Shi,* 525 F.3d at 728 (officer's "rearticulation of the *Miranda* rights eliminated whatever confusion did exist").

A signed waiver, although not dispositive, factors into the determination that the waiver was voluntarily made.  *See e.g. Butler,* 441 U.S. at 373 ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver."); *United States v. Bernard S.,* 795 F.2d 749, 753 n. 4 (9th Cir. 1986) ("[A]lthough not dispositive, a written waiver of one's *Miranda* rights is 'strong' evidence that the waiver is valid.").  Santiz-Gomez signed the waiver only after she was informed that the questions Agent Moreno wanted to ask her were not about the deportation, but were regarding Agent Berrios.  (*See e.g.* Interview, p. 8 (after Santiz-Gomez indicated she would speak, Agent Moreno again asked whether Santiz-Gomez wanted to talk to him and she was clear that she would speak about the officer)).

Santiz-Gomez points out that Agent Moreno never told her what charges she was facing until the end of the interview and that she had been told by Agent Roman that she was under arrest for administrative immigration proceedings with no mention of criminal

charges.  (*See* Reply (Doc. 29), p. 3).    The Supreme Court has declined to hold that "[m]ere silence by law enforcement officials as to the subject matter of an interrogation is 'trickery' sufficient to invalidate a suspect's waiver of *Miranda* rights.…"  *Colorado v. Spring,* 479 U.S. 564, 576 (1987).   Agent Moreno denied knowledge as to whether an investigation had been undertaken regarding Santiz-Gomez' allegations of excessive force against Agent Berrios.  (Tr. at p. 158).   He testified that any such investigation would be performed by the Critical Incident Team.  (*Id.*).   He testified that he did not mention any difference between the Critical Incident Team and his investigation to Santiz-Gomez, "[b]ecause we weren't…interviewing for that."   (*Id.*).   By "that" the Magistrate Judge presumes Agent Moreno to be referring to an excessive force claim lodged against Agent Berrios.   There is no showing that Agent Moreno was aware of any such claim.   Careful review of the interview transcript suggests no attempt by Agent Moreno to trick Santiz-Gomez into thinking that the interview was about allegations of excessive force.   He made clear that she understood that she had been arrested and said he wanted to ask her questions regarding the official, and she agreed to answer same without counsel after having first clarified that the questions did not concern her deportation.   Santiz-Gomez' statements during the interview at no time indicated to Agent Moreno that she was attempting to seek action against Agent Berrios or that she saw the interview as a part of such a process.

Santiz-Gomez also asserts that Agent Moreno "hopelessly confused up to three different sets of rights, including [her] administrative rights of which she had earlier been advised, her right to report the 'too rough' treatment by 'the officer' who arrested her, and her *Miranda* rights relevant to the admissibility…" of her statements in a criminal proceeding.  (Reply, (Doc. 29), p. 3).   During the interview, Agent Moreno referred to three sets of rights:   *Miranda* rights which applied to statements being used against her "in a court of law or any administrative immigration proceedings…", (Interview, p. 4), her rights on Form 826, (Interview, pp. 9-10), and her "consulate rights" (Interview, p.10).   While some instances of confusion between administrative rights and *Miranda*

rights can invalidate a waiver of *Miranda* rights, *see San Juan,-Cruz,* 314 F.3d at 388-89, Santiz-Gomez fails to articulate how such confusion ensued in this case.

In *San Juan-Cruz,* the defendant was first read administrative rights that included that he had the right to have an attorney present during questioning but not at the government's expense. "Soon thereafter, San Juan was warned that he also could be charged criminally and was read…" the *Miranda* advisement. *San Juan-Cruz,* 314 F.3d at 386-87; *see also id.*at 389 (noting the time elapsing between the two warnings was not dispositive on the facts before the court because, "[m]ore important than the timing of the Government's warnings is whether the substance, content, and clarity of the warnings conveyed to San Juan his rights under *Miranda*.") The Ninth Circuit stated that: "From San Juan's perspective, it was entirely unclear what the nature of his rights was under the Fifth Amendment. Specifically, San Juan could not reasonably ascertain from the warnings provided to him by the Government whether he could or could not retain the services of an attorney for free." *Id.* at 387; *see also id.* at 389 ("When a warning, not consistent with Miranda, is given prior to, after, or simultaneously with a *Miranda* warning, the risk of confusion is substantial, such that the onus is on the Government to clarify to the arrested party the nature of his or her rights under the Fifth Amendment."). The *San Juan-Cruz* court also pointed out that although the agent "could have rectified the situation easily by clarifying his statements or advising San Juan to disregard the Administrative Rights in favor of those that were read to him under *Miranda,...*[the agent]…did neither." *Id.* at 389.

"In order to be valid, a *Miranda* warning must convey *clearly* to the arrested party that he or she possesses the right to have an attorney present prior to and during questioning….The warning also must make clear that if the arrested party would like to retain an attorney but cannot afford one, the Government is obligated to appoint an attorney for free." *Id.* at 388 (internal citation omitted). Unlike the agent in *San Juan-Cruz,* Agent Moreno, after reading the *Miranda* advisement, further explained during his conversation with Santiz-Gomez that "[t]he lawyer can advise you"; that she could, if she

preferred, "have a lawyer present with you before I ask you questions"; and "if you have no money to employ an attorney the government of the United States can give you one for free."  (Interview, pp. 5-6).  In light of Agent Moreno's statements that Santiz-Gomez could request an attorney free of charge, the instant record forecloses the possibility of confusion as to whether an attorney would be provided free of charge.[4]

Although the exchange between Santiz-Gomez and Agent Moreno leading up to wavier first indicated Santiz-Gomez' initial confusion, the totality of the circumstances supports the conclusion that Santiz-Gomez' questions to Agent Moreno concerning the advisement and Agent Moreno's clarification of same resulted in a voluntary, knowing, and intelligent waiver.  Santiz-Gomez' motion to suppress post-*Miranda* statements to Agent Moreno should be denied.

Santiz-Gomez also points out "that Agent Moreno asked and obtained answers to fifteen questions before even attempting to advise [her] of her *Miranda* rights.  Clearly the government cannot meet its burden with regard to that portion of the custodial interrogation."  (Reply (Doc. 29), p. 3).  The government has not offered any basis to support admission of the pre-*Miranda* statements Santiz-Gomez made to Agent Moreno.  Consequently, these statements should be suppressed.

While the Court finds in this case that a *Miranda* waiver was adequately obtained and the post-*Miranda* statements are admissible, it is clear that confusion was present at times during these interviews, and such confusion is likely commonplace in the Border Patrol interrogation process.  Over several hours, suspects are questioned by at least three different people for three different purposes.  The lack of coordination between the three examiners makes it difficult to explain why there is such a difference between the various rights explained.  One step towards cleaning up that confusion would be to explain the charges being investigated at the beginning of the interrogation, instead of, as here, the end.  The difficulty in avoiding confusion is emphasized by the solution suggested by the

---

[4] Agent Moreno's later advisement that the administrative rights on Form 826 no longer applied, (Interview, p. 10), does not factor into the waiver analysis given that he made this statement after Santiz-Gomez signed the *Miranda* waiver.

appellate court in *San Juan-Cruz*, advising the suspect to disregard the administrative rights.  For many suspects, the administrative proceeding may be more important than the criminal proceeding.  Advising a suspect/defendant to disregard those important rights hardly seems a step in the right direction for that person to deal with the complex potential consequences facing him or her.

Border Patrol is encouraged to emphasize policies, training and supervision to accommodate the inherent confusion in advising a suspect about these important but conflicting sets of rights.  The reality is confessions are easy to obtain in this setting and frequently not as critical due to the reactive nature of the cases.  Little is lost by the government in taking extra steps to assure immigration law violators clearly understand all their rights for all purposes.

**CONCLUSION**

Because both Defendants' statements to Agent Berrios in the field immediately upon apprehension were not subject to *Miranda* and were voluntary, the statements are admissible.  Further, Santiz-Gomez did not invoke her right to counsel under *Miranda* in the field.  Santiz-Gomez' pre-*Miranda* statements to Agent Moreno during the taped interview should be suppressed; however, her post-*Miranda* statements to Agent Moreno are admissible.  Finally, because the government does not intend to introduce statements Defendants made to Agents Berrios and Roman in the field 45 minutes after apprehension while being questioned at the Border Patrol vehicles, or statements Defendants made to Agents Soto and Manning during immigration processing at the Border Patrol Station, Defendants' request to suppress these statements are moot.

**RECOMMENDATION**

For the foregoing reasons, the Magistrate Judge recommends that the District Court, after its independent review:

(1)    deny Defendant' Mendez-Molina's Motion to Suppress Statements (Doc. 19); and

(2)    grant in part and deny in part Defendant Santiz-Gomez' Motion to Suppress

Statements (Doc. 24).  The Motion should be granted to the extent that Defendant Santiz-Gomez' pre-*Miranda* statements made to Agent Moreno should be suppressed.  The Motion should be denied to the extent that Defendant Santiz-Gomez seeks to suppress statements made to Agent Berrios in the field immediately upon apprehension and post-*Miranda* statements made to Agent Moreno.  The Motion should also be denied as moot to the extent that Defendant Santiz-Gomez seeks to suppress statements made to Agents Roman and Soto.

Pursuant to 28 U.S.C. §636(b), the parties have **FOURTEEN (14) DAYS** from the date of this Report and Recommendation to file written objections to these findings and recommendations with the District Court.  Any Objections and Responses to Objections filed should be filed as **CR 14-1633-TUC-JGZ**.  No Replies shall be filed unless leave is granted from the District Court.

Failure to file objections in accordance with Fed.R.Crim.P. 59 will result in waiver of the right to review.

Dated this 2nd day of February, 2015.


**CHARLES R. PYLE**
**UNITED STATES MAGISTRATE JUDGE**